IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PETER C. GUERRERO, | ) | CV. NO. 08-00344 DAE/BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII, | ) | |
| DEPARTMENT OF PUBLIC | ) | |
| SAFETY; JOHN DOES 1-10; DOE | ) | |
| ENTITIES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On August 20, 2009, the Court heard the motion for summary

judgment by Defendant State of Hawaii, Department of Public Safety ("PSD").

Venetia K. Carpenter-Asui, Esq., appeared at the hearing on behalf of Plaintiff

Peter C. Guerrero; Deputy Attorney General Claire W.S. Chinn appeared at the

hearing on behalf of Defendant PSD.  After reviewing the motion and the

supporting and opposing memoranda, the Court GRANTS IN PART AND

DENIES IN PART Defendant's Motion.

## BACKGROUND

Plaintiff Peter C. Guerrero was born on the island of Guam and speaks both Chamorro[1] and English. After serving as a police officer on Guam and obtaining a B.A. from Honolulu Pacific University[2], Plaintiff was hired by PSD on January 9, 2006 as a Deputy Sheriff Recruit. (Defendant's Concise Statement of Facts in Support ("Def.'s CSF") ¶ 2.)

Plaintiff then attended recruit school for five months in 2006. While at recruit school, Plaintiff claims to have been subjected to disparate treatment when: (1) other recruits teased him and called him "brown tree snake" (Mot. Ex. A at 45); (2) PSD instructors asked fellow recruits with former law enforcement experience to assist them but never asked Plaintiff, despite his background as a police officer in Guam (id. at 47-48); and (3) he was the only recruit in the class

---

[1]Chamorro is the language of the indigenous people of Guam. There appears to be some dispute as to whether Plaintiff's "race" is Guamanian or Chamorro. (See Plaintiff's Concise Statement of Facts in Opposition ("Pl.'s CSF in Oppo.") ¶ 1.) In his deposition, Plaintiff describes his "ethnic background" as Chamorro and explains that they are "the indigenous people of the island of Guam. They're called Chamorro." (Mot. Ex. A at 14:16-21.) Regardless, there appears to be no genuine dispute that Plaintiff could be the subject of discrimination based on either his race or national origin.

[2]The Court has conducted a search and has not found "Honolulu Pacific University" among Hawaii's accredited universities. See Accrediting Commission for Senior Colleges and Universities, Member Directory, http://www.wascsenior.org/directory (last visited August 20, 2009).

who was not issued a uniform jacket, despite others with the same jacket size being issued one (id. at 55-60).  Plaintiff never reported these actions to a supervisor or PSD.  (Pl.'s CSF in Oppo ¶ 3.)

On June 15, 2006, Plaintiff completed his recruit training.  He was sworn in as a Deputy Sheriff I and assigned to the Capitol Patrol detail, where his duties included the patrol and security of the State Capitol, surrounding State buildings, and Washington Place.  (Def.'s CSF ¶ 4.)  While assigned to the Capitol Patrol detail, Plaintiff was supervised by Sergeant Reid Ogata ("Sgt. Ogata")[3]. Def.'s CSF ¶ 5.)

Plaintiff claims that he was again subjected to disparate treatment by Sgt. Ogata from August 2006 through October 2006.  (SAC ¶¶ 18d-18h.)  The alleged incidents include Sgt. Ogata yelling or raising his voice to Plaintiff on several occasions, catching Sgt. Ogata and two deputies playing online computer games in the Sheriff's Office and being reprimanded by Sgt. Ogata, and Sgt. Ogata denying Plaintiff use of a patrol vehicle to inspect other State buildings despite allowing another deputy use of the patrol vehicle for the same purpose.  (Id.)

---

[3]Sgt. Ogata is not Guamanian.  All other staff and supervisors mentioned herein are not Guamanian unless otherwise noted.

3

Sgt. Ogata evaluated Plaintiff's work as a Deputy Sheriff I from January 6, 2006 to October 8, 2006 in an Employee Performance Appraisal. (Mot. Ex. C.)  The evaluation, dated October 27, 2006, rated Plaintiff's performance as "meets expectations."  (Id.)  Sgt. Ogata discussed the evaluation with Plaintiff and Plaintiff signed an acknowledgment of receipt of the evaluation on October 23, 2006.  (Id.)

Plaintiff filed a memo, dated October 10, 2006, requesting a transfer to another watch because he felt unfairly treated by Sgt. Ogata.  (Mot. Ex. D.)  The request was addressed to Lieutenant Robin Nagamine ("Lt. Nagamine"), the Commander of Capitol Patrol, and therefore Plaintiff's and Sgt. Ogata's supervisor.  (Id.)  Upon receipt of the request, Lt. Nagamine spoke with First Deputy Sheriff Frederick Caminos ("Caminos") regarding the allegations.  Shortly thereafter, Caminos informed Lt. Nagamine that another deputy assigned to the "Next Step" homeless shelter would be out on extended sick leave.  (Lt. Nagamine Decl. ¶ 8.)  Caminos, upon recommendation from Lt. Nagamine, approved temporary reassignment of Plaintiff to Next Step.  (Id.)  In a memo dated October 13, 2006, Plaintiff was notified that effective October 15, 2006, he would temporarily be assigned to Next Step, where his duties would consist of checking homeless persons in and out of the shelter.  (Pl.'s CSF in Oppo. ¶¶ 12, 14.)

4

Plaintiff contends the transfer to Next Step was done in retaliation for Plaintiff's reporting of disparate treatment.  (SAC ¶ 20.)

In December 2006, Plaintiff requested a transfer back to the Capitol Patrol.  Plaintiff was informed that he would be transferred in January 2007, under the supervision of Sgts. Ralph Shinmoto and Lester Kekua.  (Id. ¶ 23.)   On January 16, 2007, Plaintiff was reallocated to a Deputy Sheriff II.  (Def.'s CSF ¶ 16.)  The reallocation was a promotion for which Plaintiff received a salary increase.  (Id.)

Six months later, in July 2007, Lt. Nagamine was replaced by Lt. Albert Cummings ("Lt. Cummings") as Commander of Capitol Patrol.  (Def.'s CSF ¶ 17.)  On July 9, 2007, Plaintiff claims that Lt. Cummings approached Plaintiff and questioned him in the presence of approximately six sheriffs about Plaintiff working on July 6, 2007.  (SAC ¶ 26.)  Lt. Cummings allegedly said that he had told the shift sergeants to give deputy sheriffs their holiday day off in order to save overtime money.  (Id.)  Plaintiff responded that Sergeant Lester Kekua ("Sgt. Kekua") instructed Plaintiff to report for work on July 6, 2007.  Plaintiff then claims Lt. Cummings reprimanded Plaintiff for Sgt. Kekua's authorizing him to work.  (Id.)

Also in July 2007, Lt. Cummings issued a memorandum to transport coordinator Pamela DeGuzman ("DeGuzman") regarding inter-island prisoner transports. (Mot. Ex. H.) These prisoner transports are voluntary and deputies receive overtime pay for their supplementary hours worked on prisoner transports. The July memorandum supplied DeGuzman with a duty roster of deputies at the State Capitol and requested that inter-island transport assignments not conflict with a deputy's scheduled work shift. (Id.) Lt. Cummings also asked to restrict the assignments to non-work days or pre-shift hours only. (Id.)

On September 10, 2007, Plaintiff and Deputy Richard Stevenson ("Deputy Stevenson") were assigned to the first watch (9:30 p.m. to 6:00 a.m.). (SAC ¶ 30.) Despite the July memorandum, Plaintiff and Deputy Stevenson worked an off-island prisoner transport assignment on September 11, 2007 starting at 3:15 a.m., therefore overlapping with their scheduled first watch assignment.[4] (Def.'s CSF ¶ 21.) On September 11, 2007, Lt. Cummings learned that Plaintiff and Deputy Stevenson had received authorization from Sgt. Kekua to leave their

---

[4]It appears Plaintiff contends the September 11, 2007 off-island prisoner transport was "post-shift." (SAC ¶ 30; Pl.'s CSF in Oppo. ¶ 21.) A review of the "Off Island Prisoner Transport Status Report Log" for that date indicates, however, that Plaintiff was indeed scheduled to start his duties at 3:15 a.m. (Mot. Ex. I.) The Court is confused, therefore, as to why Plaintiff claims the September 11, 2007 transport occurred after his shift, which concluded at 6:00 a.m. (See SAC ¶ 30.)

6

post assignments on first watch to handle the inter-island transport.  (Lt. Cummings

Decl. ¶ 12.)  After discussing the issue with Sgt. Kekua, Lt. Cummings issued a

memorandum, dated September 11, 2007, to all watch supervisors mandating that

all deputies on the first watch not leave their post or assignments to participate in

any inter-island transport earlier than 5:00 a.m.  (Mot. Ex. J.)  The stated purpose

of the new rule was to ensure proper staffing and minimize liability issues that may

occur as a result of an unforeseen incident.  (Id.)  According to Lt. Cummings, the

September 11, 2007 has never been rescinded.[5]  (Lt. Cummings Decl. ¶ 12.)

On October 5, 2007, Plaintiff was assigned to the third watch (1:30

p.m. to 10:00 p.m.).  (SAC ¶ 31.)  On that same date, Plaintiff and Deputy

Stevenson worked a pre-shift off-island prisoner transport assignment with a start

time of 5:40 a.m.  (Id.; Mot. Ex. K.)  Despite the fact that the transport overlapped

with Plaintiff's duties by 20 minutes, Sgt. Kekua once again authorized the

assignment and instructed Plaintiff to report to work at 2:00 p.m.  (Mot. Ex. A at

215-17.)

---

[5]Plaintiff disagrees.  Plaintiff claims that Lt. Cummings immediately
rescinded the policy upon Plaintiff's transfer to the Airport detail in January 2008.
(SAC ¶ 30; Pl.'s CSF in Oppo. ¶ 21.)   Plaintiff fails to provide any evidence of
such rescission, however.  (Id.)

Six days later, on October 11, 2007, Lt. Cummings issued another memorandum to all deputies in his detail regarding inter-island transports. (Mot. Ex. L.) The memorandum prohibited deputies from working inter-island transports where the transports would conflict with their regularly scheduled duty hours. (Id.) Once again, Lt. Cummings claims the memorandum has never been rescinded. (Lt. Cummings Decl. ¶ 15.)

Several months prior, on August 13, 2007, Plaintiff was scheduled to work special duty at the State Tax Building between the hours of 6:45 a.m. to 4:45 p.m. (Id. ¶ 16.) Special duty is voluntary and provides supplemental income for deputies who request such assignments. (Mot. Ex. A at 151.) Because Plaintiff did not work his entire shift and did not find a replacement, Lt. Cummings issued a memorandum to Plaintiff regarding his actions and explaining the proper notification procedure. (Mot. Ex. M.)

In response to Lt. Cummings' memorandum, Plaintiff wrote a letter to Sheriff Lum, dated October 21, 2007, regarding his lack of knowledge of special duty policies and procedures. (Mot. Ex. O.) Based on Plaintiff's admission that he was not informed of the special duty policies and procedures, PSD made a decision to require all deputies seeking special duty assignments to sign an acknowledgment form. (Lt. Nagamine Decl. ¶ 15.) A memorandum, dated October 21, 2007, was

issued to all deputies by Special Duty Coordinator Alan Leung requiring deputies

to sign the acknowledgment form.  (Mot. Ex. O.)  The memorandum further

explained that any deputy who failed to turn in the acknowledgment form would

not be allowed to work special duty assignments until they complete the form.

(Id.)  The deadline to turn in the forms was set for October 30, 2007.  (Id.)

Plaintiff was scheduled to work special duty at the State Tax Building

on October 30, 2007.  (Lt. Nagamine Decl. ¶ 17.)  Plaintiff's assignment was

cancelled, however, despite the fact that he signed the acknowledgment form on

October 30, 2007.  (Oppo. Ex. F.)  Plaintiff claims the cancellation was in

retaliation and caused him to lose supplemental special duty income.  (Pl.'s CSF in

Oppo. ¶ 27.)  Lt. Nagamine contends the action was taken because Plaintiff had

admitted his lack of knowledge of the special duty policies and procedures in his

October 21, 2007 letter.  (Lt. Nagamine Decl. ¶ 17.)

On January 20, 2008, Plaintiff was transferred from Capitol Patrol to

Airport Detail, based on an application filed by Plaintiff.  (Mot. Ex. A at 250.)

On April 21, 2008, Plaintiff filed a charge of discrimination against

PSD with the Equal Employment Opportunity Commission ("EEOC") and the

Hawaii Civil Rights Commission ("HCRC"), alleging discrimination based on

national origin and retaliation under Title VII.  (Mot. Ex. B.)  He obtained a right

9

to sue letter dated May 15, 2008.[6]  (Oppo. Ex. O.)  Plaintiff then filed the instant

lawsuit on July 25, 2008.  (Doc. # 1.)

On September 15, 2008, Plaintiff was reassigned from the Airport

Detail to Halawa Receiving.  (Mot. Ex. A at 254; Mot. Ex. Q.)  The stated reason

for the reassignment was due to the fact that allegations were made by Deputy

Edward Stankos ("Deputy Stankos") on September 10, 2008, alleging workplace

violence.[7]  (Mot. Ex. Q.)  Due to the pending investigation, Plaintiff was

reassigned to Halawa Receiving, Plaintiff's firearm and police arrest authority

were taken away (Oppo. Ex. R), and Plaintiff was prohibited from working special

duty or any other voluntary or paid assignment (id.).

Plaintiff amended his complaint on May 20, 2009 and May 21, 2009,

resulting in the Second Amended Complaint ("SAC").  (Doc. # 41.)  The SAC

_____

[6]Plaintiff filed another dual charge of discrimination with the EEOC and HCRC on April 21, 2009, alleging additional retaliatory acts occurring on September 14, 2008.  (Oppo. Ex. S at 3.)  In this charge, Plaintiff alleges that PSD retaliated against him by opening an unfounded workplace violence investigation against him and removing his police powers.  (Id.)  Plaintiff received a right to sue letter from the EEOC on April 27, 2009, and a right to sue letter from the HCRC on May 20, 2009.  (Oppo. Exs. U & V, respectively.)  The additional allegations relating to the workplace violence investigation appear in Plaintiff's SAC.  (SAC ¶ 35.)

[7]There also appears to be evidence that Plaintiff reported feeling threatened by Deputy Stankos in relation to the incident and that Plaintiff filed a workplace violence complaint against Deputy Stankos.  (Oppo. Ex. R.)

contains two causes of action: (1) discrimination based on national origin and/or race under Title VII; and (2) retaliation under Title VII.

On May 27, 2009, PSD filed the instant motion for summary judgment, along with a concise statement of facts.  (Doc. ## 43 & 44.)  Plaintiff filed an opposition and a concise statement of facts in opposition on July 31, 2009.[8] (Doc. ## 48 & 49.)  On August 6, 2009, PSD replied.  (Doc. # 50.)

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

---

[8]PSD moves to strike Plaintiff's opposition as untimely because it was filed one day late.  (Reply at 1-2; see L.R. 7.4.)  At the hearing on this matter, counsel for Plaintiff conceded that the opposition brief was filed late and apologized for the delay.  Although the Court agrees that Plaintiff's opposition was untimely, the Court, in its discretion, denies PSD's request to strike and will consider the substance of Plaintiff's opposition papers.

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Id. at 323.  A moving party without the ultimate burden of persuasion at trial -- usually, but not always, the defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

12

judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties."). "[A]t least some 'significant probative evidence'" must be produced. T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968)). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id.  However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

<u>DISCUSSION</u>

PSD seeks summary judgment as to both Count 1 (race and/or national origin discrimination) and Count 2 (retaliation) of Plaintiff's SAC.  PSD contends they are entitled to judgment as a matter of law because: (1) several of Plaintiff's alleged instances of discrimination and retaliation are time-barred; (2) Plaintiff has failed to establish a prima facie case for race and/or national origin discrimination; and (3) Plaintiff has failed to establish a prima facie case for retaliation.  The Court will address each contention in turn.

I.      <u>Timeliness of Plaintiff's Title VII Claims</u>

PSD argues that any incidents occurring before June 27, 2007 are time barred because Plaintiff failed to file an administrative charge within 300 days of those earlier incidents.  (Mot. at 15-16.)  Plaintiff agrees that he filed his EEOC/HCRC dual complaint on April 21, 2008, thereby implicitly agreeing that the 300-day limitation period would begin on June 27, 2007.  (Oppo. at 16.)  Plaintiff, however, then asserts that actions occurring prior to June 27, 2007 are admissible "as pattern and practice evidence at trial"[9] and as "relevant background

---

[9]The Court does not construe Plaintiff's allegations as asserting a true "pattern and practice claim" under Title VII.  For one, Plaintiff's SAC clearly describes each incident as separate discrete acts of discrimination or retaliation involving different parties, locations, and/or job positions.  (SAC ¶¶ 18, 20-31, 38,

(continued...)

facts that are admissible at trial." (Id. at 16, 18.)

For this Court to have subject matter jurisdiction over an employment discrimination claim brought under Title VII the plaintiff must have first exhausted his administrative remedies by timely filing a charge with the EEOC and obtaining a right-to-sue letter. See 42 U.S.C. § 2000e-5(e); Greenlaw v. Garrett, 59 F.3d

---

[9](...continued)
41.)

Secondly, most pattern or practice claims are brought either by the EEOC or, if private, as class actions. See Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 876 (1984). Indeed, certain other circuits have explicitly rejected pattern or practice claims brought by individual private litigants. See Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759 (4th Cir. 1998) ("individuals do not have a private, non-class cause of action for pattern or practice discrimination under § 1981 or Title VII."), vacated on other grounds 527 U.S. 1031 (1999); Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 355-56 (5th Cir. 2001); Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 575 (6th Cir. 2004) ("We therefore hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs."); Babrocky v. Jewel Food Co., 773 F.2d 857, 866-67 n.6 (7th Cir. 1985) ("Plaintiffs' use of 'pattern-or-practice' language also seems to be misplaced, since such suits, by their very nature, involve claims of classwide discrimination, and the five plaintiffs, while attacking policies that would have affected all of Jewel's women employees as a class, have stated only their individual claims, not a class action.").

Moreover, Plaintiff has not provided any anecdotal or statistical evidence indicating a pattern or practice of discrimination based on race and/or national origin. See Obrey v. Johnson, 400 F.3d 691, 694, 698 (9th Cir. 2005). Nor has Plaintiff alleged that any other employees were discriminated or retaliated against. As such, the Court will not construe Plaintiff's reference to "pattern and practice" as evincing an actual claim under that scheme. Instead, the Court reads Plaintiff's assertions as merely reinforcing his contention that pre-limitations period actions can be used as "background evidence" to support his timely claims.

994, 997 (9th Cir. 1995) ("[t]o litigate a Title VII claim in federal district court, plaintiff must have exhausted her administrative remedies.").  "Although ordinarily the administrative charge must be filed within 180 days of the alleged unlawful employment practice, the deadline is extended to 300 days if the charge is initially filed with a state agency that enforces its own anti-discrimination laws."  EEOC v. Dinuba Med. Clinic, 222 F.3d 580, 585 (9th Cir. 2000); see 42 U.S.C. § 2000e-5(e)(1); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). "In Hawaii, the HCRC is authorized to grant and seek relief for discriminatory practices."  Hale v. Haw. Publ., Inc., 468 F. Supp. 2d 1210, 1219 (D. Haw. 2006). "The filing of a charge . . .  determines when the Act's time limits and procedural mechanisms commence."  Fed. Exp. Corp. v. Holowecki, 128 S. Ct. 1147, 1159 (2008).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Morgan, 536 U.S. at 113.

Here, Plaintiff filed his EEOC/HCRC charge on April 21, 2008, and therefore the limitations period begins from June 27, 2007.  Accordingly, Plaintiff may not rely on any incidents that occurred prior to June 27, 2007, as adverse actions to prove discrimination or retaliation or as bases for liability.  See id. at 114 ("While Morgan alleged that he suffered from numerous discriminatory and

retaliatory acts from the date that he was hired through March 3, 1995, the date that he was fired, only incidents that took place within the timely filing period are actionable."). Specifically, to the extent that Plaintiff alleged the following actions as bases for liability under Title VII, they are dismissed: (1) alleged disparate treatment of Plaintiff while at recruit training school between January 2006 and June 2006; (2) alleged disparate treatment by Sgt. Ogata while assigned under his supervision at Capitol Patrol between August 2006 and October 2006; and (3) alleged retaliation in reassigning Plaintiff to Next Step in October 2006.[10]

Plaintiff may, however, use these time barred actions as "background evidence" in support of any of the timely claims. See id. at 113 ("Nor does [Title VII] bar an employee from using the prior acts as background evidence in support of a timely claim."); Lyons v. England, 307 F.3d 1092, 1108, 1110-11 (9th Cir. 2002). The Court may, of course, exercise its discretion under Federal Rules of Evidence 401 and 403 in order to determine which events may be described at trial.

---

[10]The actions that fall within the permitted limitations period and therefore may provide the basis for liability are: (1) the July 2007 reprimand by Lt. Cummings regarding holiday work days and overtime; (2) the off-island prisoner transport memoranda dated September and October 2007, which Plaintiff claims were rescinded after he was reassigned; (3) cancellation of Plaintiff's special duty assignment on October 30, 2007 despite apparently signing the acknowledgment form; and (4) Plaintiff's reassignment to Halawa Receiving in September 2008 and subsequent removal of his police powers.

17

The Court also notes that Plaintiff appears to have alleged a new act of retaliation regarding the interview panel for Plaintiff's promotion interview. According to Plaintiff's opposition brief, Plaintiff submitted a memorandum requesting that the parties identified in the instant lawsuit (i.e., Lt. Nagamine and Lt. Cummings) be excused from Plaintiff's promotion review board.  (Oppo. at 14.)  Plaintiff's request was apparently denied.  (Id.)

PSD argues that this new allegation must be dismissed because Plaintiff never alleged the claim to the EEOC or the HCRC.  "The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation."  Leong v. Potter, 347 F.3d 1117, 1122 (9th Cir. 2003) (citing EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994) and Sosa v. Hiraoka, 920 F.2d 1451, 1456 (9th Cir. 1990)).  Generally, the claims raised in district court must have previously been presented to the EEOC.  Id. (citing Albano v. Schering-Plough Corp., 912 F.2d 384, 385 (9th Cir. 1990)).  The court must, however, also consider claims that were not asserted in the EEOC charge, but are asserted for the first time in the lawsuit, if those claims fell within the scope of the EEOC's actual investigation, or are 'like or reasonably related to' the allegations made before the EEOC, such that they would have been included within the scope of an EEOC investigation.  Id. (citing Sosa, 920 F.2d at 1456).

18

In this case, not only was the allegation regarding Plaintiff's promotion review panel not included in his two EEOC/HCRC complaints but it is likewise not mentioned in either his initial complaint or SAC in the instant lawsuit. Generally, a plaintiff may not raise additional claims in his response to a motion for summary judgment.  See Kaiser v. First Hawaiian Bank, 30 F. Supp. 2d 1255, 1261 n.3 (D. Haw. 1997); Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002) (citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996)).  The Court, therefore, need not undertake the "reasonably related to" analysis and, instead, dismisses the additional claim.

II.     Plaintiff's Discrimination and Retaliation Claims

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  A plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see EEOC v. The Boeing Co., --- F.3d ---, 2009 WL 2501837, at * 4 (9th Cir. Aug. 18, 2009). A plaintiff may establish a prima facie case either by meeting the four-part test laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

(1973), or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion.  Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1148 (9th Cir. 1997).   A prima facie case under McDonnell Douglas requires a plaintiff to offer proof that: (1) he belongs to a protected class; (2) he performed his job adequately or satisfactorily; (3) he suffered an adverse employment action; and (4) other similarly situated employees who do not belong to the same protected class were treated differently.  McDonnell Douglas, 411 U.S. at 802; see Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006); Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).

For a retaliation claim, the plaintiff's prima facie case consists of establishing that: "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action."  Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Vasquez v. County of L.A., 349 F.3d 634, 646 (9th Cir. 2004); Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).

Once a prima facie case has been made, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  Chuang v. Univ. of Cal.

20

Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000).  If the employer does so, the

plaintiff must then show that the articulated reason is pretextual "either directly by

persuading the [fact-finder] that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence."  Burdine, 450 U.S. at 256.

  "Direct evidence typically consists of clearly sexist, racist, or similarly

discriminatory statements or actions by the employer," Coghlan v. American

Seafoods Co., LLC., 413 F.3d 1090, 1095 (9th Cir. 2005), whereas circumstantial

evidence requires an additional inferential step to demonstrate discrimination.

When the evidence is direct, "'[w]e require very little evidence to survive summary

judgment' in a discrimination case."  Lam v. Univ. of Haw., 40 F.3d 1551, 1564

(9th Cir. 1994) (quoting Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d

1104, 1111 (9th Cir. 1991)) (alteration in original).  "But when the plaintiff relies

on circumstantial evidence, that evidence must be specific and substantial to defeat

the employer's motion for summary judgment."  Coghlan, 413 F.3d at 1095

(internal quotation marks omitted).

    Summary judgment is not appropriate if a reasonable jury
    viewing the summary judgment record could find by a
    preponderance of the evidence that the plaintiff is entitled
    to a verdict in his favor.  A plaintiff alleging employment
    discrimination "need produce very little evidence in order

> to overcome an employer's motion for summary
> judgment." . . . "In evaluating motions for summary
> judgment in the context of employment discrimination,
> [the Ninth Circuit] ha[s] emphasized the importance of
> zealously guarding an employee's right to a full trial,
> since discrimination claims are frequently difficult to
> prove without a full airing of the evidence and an
> opportunity to evaluate the credibility of the witnesses."

Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (citations omitted).

Here, PSD does not contest that Plaintiff is a member of a protected class nor do they argue he was not performing his job satisfactorily.  Instead, PSD argues that Plaintiff did not suffer an adverse employment action and that Plaintiff has failed to demonstrate that similarly situated employees were treated differently.  (See Mot. at 18-25.)  The analysis provided for these two arguments, however, relies solely on the actions which this Court has determined are time barred.  (See id. at 19, 23 ("Incidents at PSD Recruit School (2006)"); 20, 23 ("Incidents While Assigned to Capitol Patrol Detail (August 2006 - October 2006)").)  Perplexingly, PSD fails to address any of the timely events.

In his opposition brief, Plaintiff lists twelve different events in which he claims he suffered adverse employment actions.  (Oppo. at 20-25.)  The first seven fall outside of the 300-day limit and, therefore, shall not be considered for purposes of liability.  (Id. at 20-23.)  The other five, however, do fall within the

time period and can be considered.  Because PSD raised the arguments regarding

adverse employment actions and treating similarly situated employees differently,

and because Plaintiff responded with all of the alleged adverse employment actions

in his opposition brief, the Court will address each alleged incident in turn.

       For a discrimination claim, adverse actions are defined as those that

"materially affect the compensation, terms, conditions, or privileges of

employment."  Chuang, 225 F.3d at 1126; Davis, 520 F.3d at 1089.  "Title VII

does not limit its reach only to acts that take the form of cognizable employment

actions such as discharge, transfer, or demotion."  Lyons, 307 F.3d at 1118

(quotation marks and citation omitted).

       The definition of adverse action for a retaliation claim is broader. An

adverse action for purposes of a retaliation claim is defined as an action that "is

reasonably likely to deter employees from engaging in protected activity."  Ray,

217 F.3d at 1243; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68

(2006) (a challenged action is materially adverse if "it might have 'dissuaded a

reasonable worker from making or supporting a charge of discrimination.'")

(citation omitted).

       Although adverse action is defined broadly, not every employment

decision amounts to an adverse employment action.  Ray, 217 F.3d at 1240.  For

23

example, for a retaliation claim, "normally petty slights, minor annoyances, and simple lack of good manners will not create [a] deterrence" from engaging in protected activity.  Burlington N., 548 U.S. at 68.  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id. To determine whether a particular action is materially adverse, the court must employ an objective standard and consider the context and circumstances of the particular case.  Id. at 68-69, 71.

"[A]ssigning more, or more burdensome, work responsibilities, is an adverse employment action."  Davis, 520 F.3d at 1089. Transferring job duties, or actions that negatively affect the employee's compensation have also been found to constitute adverse employment actions.  Fonseca v. Sysco Food Servs. of Ariz., Inc., 374 F.3d 840, 847 (9th Cir. 2004); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).  Being excluded from meetings, seminars, and positions that would have made the employee eligible for salary increases, and being given a more burdensome work schedule, if proven, were sufficient to establish adverse employment actions.   Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 869 (9th Cir. 1996). In addition, undeserved performance ratings can constitute an adverse employment action. Yartzoff, 809 F.2d at 1378.  However, a mediocre

performance rating that does not give rise to any further negative employment action does not constitute an adverse employment action.  Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1112-13 (9th Cir. 2000).

"Similarly situated" employees are those who have similar jobs and display similar conduct.  See Metoyer v. Chassman, 504 F.3d 919, 950 (9th Cir. 2007) (citing Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) and Vasquez, 349 F.3d at 641).  Moreover, "[e]mployees in supervisory positions are generally deemed not to be similarly situated to lower level employees."  Vasquez, 349 F.3d at 641.

A.     Lt. Cummings' Oral Reprimand Regarding Days Worked

As for the first incident, involving Lt. Cummings' reprimand of Plaintiff due to his working on a holiday, the Court finds such events do not rise to the level of adverse employment action cognizable under Title VII.  An oral reprimand, without more, fails to constitute "a material change in the terms and conditions" of Plaintiff's employment.  See Chuang, 225 F.3d at 1126.  It did not go on Plaintiff's record and it appeared to be a minor incident.  In Kortan, for example, the Ninth Circuit found that an undeserved rating on an official evaluation was not an adverse employment action since it was not disseminated, and it was not accompanied by a change in work load or assignments, reduction of

25

salary, denial of a raise, suspension, or termination.  217 F.3d at 1113.  Similarly in

Lyons, the Ninth Circuit found that the employer's mediocre performance

evaluations of the plaintiff were not adverse employment actions since the plaintiff

had not alleged that the evaluations were published, or that they caused the plaintiff

to be relieved of responsibilities or saddled with burdensome tasks.  307 F.3d at

1118; see also Rivera v. England, 360 F. Supp. 2d 1104, 1121 (D. Haw. 2005) (a

negative evaluation that does not remain in the employee's personnel file is not an

adverse employment action).  Indeed, there appears to be no tangible harm in either

Plaintiff's position, pay, work duties, or reputation resulting from the oral

reprimand.  See Strother, 79 F.3d at 869.

        Moreover, Plaintiff has failed to demonstrate how the reprimand

resulted in similarly situated employees being treated differently.  To the extent

that Plaintiff claims Sgt. Kekua was not reprimanded for, in fact, inappropriately

authorizing Plaintiff's work on a holiday, Sgt. Kekua is clearly not a similarly

situated employee.  See Vasquez, 349 F.3d at 641.  Sgt. Kekua was acting as

supervisor to Plaintiff at the time and, as a result, Lt. Cummings may have wished

to resolve any issues with Sgt. Kekua out of the presence of lower-ranking

deputies.  No matter the reason, it is clear that Sgt. Kekua is not similarly situated

to Plaintiff and, therefore, Lt. Cummings' failure to reprimand him does not violate Title VII.

As such, the Court finds that Plaintiff has failed to allege a prima facie case for discrimination or retaliation based on the reprimand and PSD is therefore GRANTED summary judgment with respect to that claim.

B.      Off-Island Prisoner Transport Memoranda

Plaintiff also appears to allege that he was subjected to adverse employment actions when Lt. Cummings issued the two off-island prisoner transport memoranda in September and October of 2007.  (See Oppo. at 24-25.) To the extent that Plaintiff's allegations rest on the issuance of the memoranda alone, those allegations must fail.  There is no better example of similarly situated employees being treated similarly than a department-wide memorandum instituting new policy that will apply to all deputies.  Plaintiff was not named in the memoranda as the reason for the new policy or in any way affected differently than the rest of his deputies.

To the extent that Plaintiff claims Lt. Cummings immediately rescinded the policies once Plaintiff was transferred out of Capitol Patrol detail, Plaintiff has failed to demonstrate any evidence whatsoever of such rescission other than his unsupported allegations.  There is simply no indication in the record

27

that the policies were rescinded and, if so, when.  Instead, the only evidence

regarding the current state of the policies comes from Lt. Cummings' declaration,

in which he states the memoranda have never been rescinded.[11]  (Lt. Cummings

Decl. ¶¶ 12, 15.)  In opposing a motion for summary judgment, the Plaintiff "must

produce evidence in response . . . [h]e cannot defeat summary judgment with

allegations in the complaint, or with unsupported conjecture or conclusory

statements."  <u>Hernandez v. Spacelabs Medical Inc.</u>, 343 F.3d 1107, 1112 (9th Cir.

2003).

      In addition, even assuming the memoranda were, in fact, rescinded,

such action would affect all deputies in the same manner.  As such, any alleged

rescission would not constitute an adverse employment action against Plaintiff

---

[11]Of course, Plaintiff relies on his own declaration as evidence that the policies were rescinded.  (Guerrero Decl. ¶¶ 56, 57.)  However, Plaintiff, having been reassigned out of the Capitol Patrol detail, has not provided the Court with any reason to believe he has any personal knowledge of a rescission.  Lt. Cummings, on the other hand, as current Commander, has personal knowledge of the current state of the policies and provided the Court with copies of the memoranda.  Plaintiff may not create a genuine issue of material fact to survive summary judgment by merely relying on, without more, his own, self-serving assertions.  <u>See</u> <u>Villiarimo v. Aloha Island Air Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002); <u>Rivera v. Nat'l R.R. Passenger Corp.</u>, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

(because he no longer worked at Capitol Patrol detail) nor would it treat similarly situated employees differently.

Accordingly, summary judgment is GRANTED with respect to Plaintiff's discrimination and retaliation claims involving the September and October 2007 memoranda and their alleged rescission.

C.   <u>Special Duty Policies and Procedures</u>

Plaintiff next claims that he was subjected to an adverse employment action when his special duty shift was cancelled on October 30, 2007.  (Oppo. at 23.)  Plaintiff contends that Deputy Patrick Quinlin ("Deputy Quinlin") worked Plaintiff's special duty shift that day despite not signing the acknowledgment form. (<u>Id.</u>)  Plaintiff also asserts that other deputies, including Deputy Sheriff Chris Lee ("Deputy Lee"), worked special duty without signing the acknowledgment form. PSD contends that Plaintiff's shift was cancelled because Plaintiff had admitted his lack of knowledge of the special duty policies and procedures in his earlier memorandum.  (Mot. at 12.)

Here, Plaintiff has sufficiently demonstrated a prima facie case for discrimination.  The refusal to permit Plaintiff to work special duty directly impacted his ability to make supplemental income.  As such, it may constitute an adverse employment action because it directly affected his potential work duties

29

and pay.  In addition, if true, it appears PSD treated other similarly situated deputies differently.  Deputies Quinlin and Lee worked similar positions to Plaintiff and both allegedly failed to sign their acknowledgment forms.  As such, Plaintiff has stated a prima facie case for race and/or national origin discrimination.

PSD contends that it has established a legitimate nondiscriminatory reason for its decision to suspend Plaintiff from working special duty.  (Mot. at 36-37.)  PSD argues that Plaintiff's suspension was necessary due to the fact that he had admitted a lack of knowledge of the special duty policies and procedures.  (Id.)  As such, PSD contends the decision was "based on operational necessity to have knowledgeable deputies who were aware of" the special duty policies and procedures.  (Id. at 37.)

Because the Court finds that PSD has demonstrated a legitimate nondiscriminatory reason for the decision, the Court shifts the burden to the Plaintiff to establish that PSD's reasons were pretextual.  See Burdine, 450 U.S. at 256.  Here, the Court finds that Plaintiff has met that burden.  Most compelling is the evidence indicating that Plaintiff had, in fact, signed the acknowledgment form on October 30, 2007, the deadline for such forms and the night in which he was

originally assigned to special duty.[12]  (See Oppo. Ex. F.)  The Court finds this

evidence sufficient to establish that a genuine issue of material fact exists as to the

reasons behind PSD's decision to suspend Plaintiff's special duty assignments.

The Court, therefore, DENIES PSD's motion for summary judgment with respect

to this claim.

        The Court finds, however, that Plaintiff has not demonstrated a prima

facie case for retaliation.  Assuming Plaintiff was subjected to an adverse

employment action by having his special duty shift cancelled, Plaintiff cannot meet

the first or third prongs of the test.

        First, it is not clear that Plaintiff engaged in a protected activity.  To

the extent that Plaintiff alleges he was retaliated against for writing his October 21,

2007 letter to Sheriff Lum regarding his knowledge of special duty policies and

procedures, such activity is not "protected" under Title VII because it involves no

allegation relating to discrimination.  "Title VII's statutory 'opposition clause'

_____

        [12]At the hearing on this matter, counsel for PSD contended that the reason
Plaintiff's October 30, 2007 special duty shift was cancelled was because these
assignments must be scheduled and posted one week in advance.  Counsel
represented that the declaration of Lt. Nagamine would clarify this for the Court.
A review of Lt. Nagamine's declaration, however, indicates that deputies were
supposed to have been allowed to work their special duty assignments until 11:59
p.m. on October 30, 2007, without signing the acknowledgment form.  (Lt.
Nagamine Decl. ¶ 16.)  There is no discernable reason on the record, therefore, for
Plaintiff's shift on October 30, 2007 to have been cancelled.

prohibits an employer from retaliating against an applicant or employee 'because

he has opposed any practice made an unlawful employment practice,'" such as

discrimination based on race, sex, religion, sex, or national origin. EEOC v. Luce,

Forward, Hamilton & Scripps, 303 F.3d 994, 1005 (9th Cir. 2002) (citing 42

U.S.C. § 2000e-3(a)); see, e.g., Passantino v. Johnson & Johnson Consumer Prods.,

212 F.3d 493, 506 (9th Cir. 2000) ("Title VII allows employees to freely report

actions that they reasonably believe are discriminatory, even if those actions are in

fact lawful."). In addition, Title VII makes "it unlawful for an employer to

discriminate or retaliate against an employee or an applicant for employment

because that person 'has made a charge, testified, assisted, or participated in any

manner in a . . . proceeding.'" Luce, 303 F.3d at 1006 (ellipses in original) (citation

omitted). In sum, "[p]rotected activity includes the filing of a charge or a

complaint, or providing testimony regarding an employer's alleged unlawful

practices, as well as engaging in other activity intended to 'oppose[ ]' an

employer's discriminatory practices." Raad, 323 F.3d at 1197 (brackets in

original).

In this case, Plaintiff's letter regarding special duty policies and

procedures was unrelated to PSD's alleged discriminatory practices. The letter,

therefore, cannot be characterized as protected activity because the activity about

which he complained (i.e., requiring all deputies to sign the special duty

acknowledgment form) is not prohibited by Title VII.

Moreover, even if the Court were to determine that Plaintiff's reports

of disparate treatment in 2006 were protected activities, Plaintiff has failed to

allege a causal link between those earlier reports and the alleged retaliation on

October 30, 2007.  For one, more than eleven months lapsed between Plaintiff's

last alleged protected activity (see Oppo. at 26 ¶ 2) and the cancellation of

Plaintiff's shift.  As such, Plaintiff has failed to demonstrate any compelling

temporal proximity.  See Clark County School Dist. v. Breeden, 532 U.S. 268,

273-74 (2001) (holding that those cases which accept mere temporal proximity as

sufficient evidence of causality to establish a prima facie case uniformly hold that

temporal proximity must be "very close.").  In addition, Plaintiff has failed to

allege "circumstantial evidence of a 'pattern of antagonism' following the

protected conduct."  Porter v. Cal. Dep't of Corrs., 419 F.3d 885, 895 (9th Cir.

2005) (holding temporal proximity alone is not determinative of causality).

Indeed, it appears Plaintiff relies solely on alleged temporal proximity to support

the causal link.  (See Oppo. at 28-29 (solely discussing temporal proximity).)

As such, this Court finds that Plaintiff has failed to make out a prima facie case for retaliation and therefore GRANTS summary judgment with respect to this claim.

     D.    <u>Reassignment to Halawa Receiving and Removal of Plaintiff's Powers</u>

Finally, Plaintiff claims that he was subjected to an adverse employment action by being reassigned to Halawa Receiving in September 2008 and stripped of his firearm, his police powers, and his ability to work supplemental shifts.  PSD claims that it engaged in these actions in response to a workplace violence complaint filed against Plaintiff by Deputy Stankos.

The Court finds that Plaintiff has stated cognizable claims for both discrimination and retaliation.  To be sure, transferring Plaintiff to another assignment and stripping him of duties and opportunities for supplemental income constitute an adverse employment action.  <u>Chuang</u>, 225 F.3d at 1126 (adverse employment actions are those which "materially affect the compensation, terms, conditions, or privileges of employment."); <u>Fonseca</u>, 374 F.3d at 847 (finding adverse employment action for retaliation claim when employer transferred job duties, or took actions that negatively affected the employee's compensation).  Moreover, if Plaintiff is correct, it appears Plaintiff was the only party to the

34

altercation whose job was reassigned and who lost privileges, despite his making

cross-allegations about Deputy Stankos.  (See Oppo. Ex. R.)  As such, Plaintiff has

stated a prima facie case for discrimination.

The Court also finds Plaintiff has stated a prima facie case for

retaliation under Title VII.  Plaintiff's filing of his EEOC/HCRC complaint and

instituting of the instant lawsuit certainly qualify as protected activities.  In

addition, there is sufficient evidence indicating some causal link between the

protected activities and his transfer.  While the transfer was not extremely close in

time after the filing of the EEOC/HCRC complaint or the lawsuit, the Court finds

such temporal proximity sufficient for the purposes of summary judgment.

PSD contends that it had a legitimate reason for transferring Plaintiff

to Halawa Receiving and stripping him of certain duties and privileges.  (Mot. at

38.)  Specifically, PSD claims that it was responding appropriately to a claim of

workplace violence alleged by Deputy Stankos.  (Id.)  The Court finds these

asserted reasons legitimate.

Because the Court finds PSD's reason legitimate, the Court next asks

whether Plaintiff can demonstrate PSD's reasons are pretextual.  The Court agrees

with Plaintiff that there is at least a genuine issue of material fact as to PSD's

motivations in transferring Plaintiff.  According to Plaintiff, PSD only transferred

35

Plaintiff and did not strip Deputy Stankos of any of his responsibilities or

privileges, despite Plaintiff's cross-complaint of workplace violence against

Deputy Stankos.  If PSD were merely investigating a complaint of workplace

violence, then it theoretically should have suspended Deputy Stankos in the same

manner as it did Plaintiff.  As such, this Court finds that Plaintiff's claims of

discrimination and retaliation with respect to Plaintiff's transfer to Halawa

Receiving are sufficient and the Court, therefore, DENIES PSD's motion for

summary judgment with respect to these claims.

## CONCLUSION

For the reasons stated above, the Court GRANTS IN PART AND

DENIES IN PART PSD's motion for summary judgment.  The claims that survive

summary judgment are as follows: (1) discrimination based on race and/or national

origin with respect to PSD's decision to suspend Plaintiff's ability to work special

duty assignments; (2) discrimination based on race and/or national origin with

respect to Plaintiff's transfer to Halawa Receiving and subsequent removal of

duties and privileges; and (3) retaliation with respect to Plaintiff's transfer to

36

Halawa Receiving and subsequent removal of duties and privileges.  All other

claims are hereby DISMISSED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 24, 2009.



_____
David Alan Ezra
United States District Judge

Guerrero v. State of Hawaii, Department of Public Safety, et al., Civ. No. 08-00344
DAE/BMK; ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT