IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PETER C. GUERRERO, | ) | Civ. No. 08-00344 BMK |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII, | ) | |
| DEPARTMENT OF PUBLIC | ) | |
| SAFETY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Peter C. Guerrero filed this action against the State of Hawaii Department of Public Safety ("DPS"). Guerrero is a deputy sheriff employed by DPS and claims that DPS discriminated against him based on his race and national origin, and retaliated against him. Guerrero contends that DPS's actions violated Title VII of the Civil Rights Act of 1964 and prays for compensatory damages, special damages, fees, and costs.

After careful consideration of the evidence and arguments presented at trial, the Court concludes that Guerrero fails to establish that DPS violated Title VII.

<u>FACTS</u>

Guerrero was born in Guam, and his race/ethnicity is Chamorro.  He started his law enforcement career in 1998 in Guam.  He eventually moved to Hawaii and was hired by DPS as a deputy sheriff recruit on January 9, 2006.  On June 15, 2006, he became a deputy sheriff.  Guerrero claims that he was treated differently than non-Guamanians since he was a deputy sheriff recruit.

I.       Special Duty Work

Guerrero enjoyed working Special Off-Duty Employment ("special duty"), which is "performed for compensation by an officer for an employer other than [DPS]."  (Ex. 111 at 1.)  He particularly wanted to work special duty assignments because he could make extra money in addition to his base salary.

On August 13, 2007, while working a special duty assignment at the State Department of Taxation, Guerrero fell ill and needed to leave that assignment three hours early.  He was unaware of the special duty policies and procedures that required him to contact particular supervisors and to find a replacement for his assignment.  Instead, Guerrero informed another deputy that he was leaving early.

Lieutenant Albert Cummings notified Guerrero that he failed to comply with special duty policies and procedures.  In response, Guerrero wrote to then-Sheriff John Lum, stating that he was unaware of the policies and procedures

and was never informed of them.  (Ex. 112.)  This concerned Sheriff Lum because all deputy sheriffs serving special duty were required to understand the policies and procedures.  Thus, as a result of Guerrero's memo, Sheriff Lum required that all deputies who work special duty assignments sign a Special Duty Acknowledgment Form, thereby acknowledging that they read and understood the policies and procedures.  When Sheriff Lum decided to make October 30, 2007 the deadline to sign and submit the Form, he was unaware that Guerrero had a special duty assignment on that date.

Sergeant Alan Leung, the Special Duty Coordinator, prepared the Acknowledgment Form and an accompanying memo explaining that the "chief purpose of the acknowledgment form is to ensure deputies working special duty assignments understand the Sheriff Division policy and procedures dealing with Special duty."  (Ex. 24.)  The memo also warned that any "Deputy not turning in their acknowledgment form will not be allow[ed] to work any special duty assignments until they complete the form."  (Id.)  Sheriff Lum also testified that the Acknowledgment Form was not implemented because of Guerrero's race or national origin, but rather to ensure that deputies understood the policies and procedures.

A few days prior to the October 30, 2007 deadline, Sheriff Lum asked Leung to contact Guerrero to remind him to sign the Form because Guerrero was the only deputy that Sheriff Lum knew to be unfamiliar with the policies. According to Leung, he called Guerrero, who stated that he would not sign the Form. After Leung told Sheriff Lum that Guerrero refused to sign the Form, Sheriff Lum directed Leung to find a replacement for Guerrero's October 30, 2007 special duty assignment. Leung received Guerrero's signed Form the next day, on October 31, 2007. In contrast to Sheriff Lum's and Leung's testimony, Guerrero testified that he never told Leung that he would not sign the Form.

On April 21, 2008, Guerrero filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter on May 15, 2008. Guerrero filed this federal action on July 25, 2008.

II.        Workplace Violence Complaints

On September 10, 2008, an incident occurred where Guerrero attempted to pull over an unmarked sheriff's vehicle that deputy sheriff Edward Stankos was driving. Guerrero and Stankos have very different versions of what happened that evening.

A.        Stankos's Version of the Events

According to deputy Stankos, at about 7:00 p.m. that evening, he was driving an unmarked Chevy Blazer with deputy sheriff J. Nakamura as a passenger. (Ex. 115.)  While driving along Lagoon Drive, Stankos noticed a sheriff's vehicle turn on his blue and red strobe lights behind him in an attempt to pull Stankos's vehicle over.  (Id.)  Stankos thought it was a joke, but pulled over anyway.  (Id.) After shining a spotlight on Stankos's vehicle, the deputy who pulled them over "left and sped away at a high rate of speed."  (Id.)  Stankos did not know which deputy sheriff had pulled him over.  (Id.)

At about 9:45 p.m., when Stankos was unloading equipment from the Chevy Blazer at the Airport, he heard Guerrero yelling at deputy Nakamura in the parking lot.  (Id.)  When Stankos walked up to them, Guerrero "focused all of his rage solely on" Stankos.  (Id.)  Guerrero was yelling and swearing at Stankos and told Stankos, "Just watch, we'll see what's gonna happen."  (Id.)  Stankos "immediately took that as a threat and felt that [Guerrero] might cause me bodily harm, as he was wearing his gun belt with his assigned firearm on his hip, and through my years of experience and training viewed his stance and demeanor as that of an angry aggressive person."  (Id.)   Although Stankos remained calm, he "did not feel [he] was in a safe situation," so he left.  (Id.)

B.    Guerrero's Version of the Events

According to Guerrero, he noticed an unmarked sports utility vehicle with an expired safety inspection tag and "then activated [his] emergency lights on [his] patrol car in an attempt to pull suspect vehicle over." (Ex. 36.) The vehicle "sped away" and made "an erratic right turn" and "unsafe lane change without signaling." (Id.) Guerrero "was on pursuit of this vehicle" and when the vehicle finally stopped, he "activated the patrol spot light and illuminated the suspect's vehicle interior." (Id.) Next, Guerrero says he:

> drew my firearm towards the occupants of the vehicle. At this point, I observed the driver bending forward as if he was reaching for something underneath his seat. The driver then glanced towards the left at which time I noticed that the driver was Deputy E. Stankos who appeared to be laughing. I also noticed that the other occupant . . . was Deputy J. Nakamura.

(Id.) Guerrero left after realizing who was in the vehicle. At about 9:40 p.m. that evening, Guerrero says he asked Stankos "why he felt that I would joke around with him while on duty when I never did." (Id.)

C.      Workplace Violence Complaints and Consequences

On September 11, 2008, the day after this incident occurred, Stankos submitted a workplace violence complaint against Guerrero. He recounted the events as he remembered them and stated that, "[d]ue to [Guerrero's] intimidation, and threatening words and behavior, I feel the hostility in my work environment is

6

overwhelming." (Ex. 115.) Stankos's complaint asked for "immediate assistance in this situation." (Id.)

After reading Stankos's complaint, Sheriff Lum followed standard DPS procedures when a workplace violence complaint is submitted, which is to separate the parties by removing the alleged aggressor from the work site. According to Stankos's complaint, Guerrero was the aggressor. Thus, the next day, on September 12, 2008, Sheriff Lum informed Guerrero that he was being transferred to the Halawa Receiving Section pending the investigation. (Ex. 35.) Sheriff Lum also followed standard procedures by having Guerrero and Stankos cease and desist from contacting each other. Lieutenant Nagamine testified that the decision to transfer Guerrero was not based on his race or national origin.

Guerrero did not submit his incident report about the traffic stop until September 14, 2008. (Ex. 36.) Nowhere in that report did Guerrero mention feeling threatened by Stankos. However, on September 16, 2008, Guerrero submitted his "Workplace Violence Complaint" against Stankos. (Ex. 37.) For the first time, Guerrero alleged that he "felt threatened by" Stankos on September 10, 2008 and "felt that he might have attacked me at that moment." (Id.)

Sheriff Lum testified that, after receiving Guerrero's workplace violence complaint, he did not transfer deputy Stankos because Guerrero and

Stankos were already separated due to Guerrero's transfer to Halawa. Sheriff Lum stated that the purpose of the standard operating procedure is to separate the parties. Because Guerrero had already been transferred to Halawa, there was no reason to transfer Stankos from the Airport. Further, Sheriff Lum testified that transferring Stankos would have created a hardship because it would be difficult to find a replacement for both Stankos and Guerrero at the Airport when the Sheriff's Division is so small.

Later, on October 2, 2008, Sheriff Lum limited Guerrero's authority as a deputy sheriff to the eight hours he was on duty at the Halawa Receiving Desk. (Ex. 41.) While off-duty, Guerrero had "no authority as a Deputy Sheriff" and his "arrest powers and issued weapon" were taken away from him. (Exs. 41-42.) Sheriff Lum testified that this decision was based on Guerrero's drawing his firearm during a routine traffic stop, especially because he drew his firearm before observing the driver bend over to reach for something below his seat. After reading Guerrero's memo, Sheriff Lum and Lieutenant Nagamine were concerned because deputies should not draw their firearm during a routine traffic stop. Sheriff Lum stated that, based on Guerrero's chronology of events as stated in the memo, he should not have drawn his firearm. The fact that Guerrero drew his gun unfoundedly was a safety concern for Sheriff Lum, and he intended to have

Guerrero retrained on the proper use of his firearm. Additionally, Sheriff Lum testified that it is standard procedure to remove a deputy's police powers and firearm if a firearm is drawn. As a result, Sheriff Lum removed Guerrero's firearm and limited his deputy sheriff authorities to his on-duty hours.

After the investigation into the workplace violence complaints was finished, Guerrero was reassigned back to the Airport Section. (Ex. 122.)

On April 21, 2009, Guerrero filed a second complaint with EEOC and received a right to sue letter on April 27, 2009.

III.        Non-Promotion to Deputy Sheriff III

In early 2009, DPS posted vacancy announcements for two Deputy Sheriff III positions on Oahu and three positions on other islands. (Exs. 139-40.) Guerrero, who is a Deputy Sheriff II, decided to apply for the positions. Deputies applying for the positions were required to take a written test and oral interview. The scores an applicant received for the written test and oral interview governs whether they receive the promotion to Deputy Sheriff III.

On June 15, 2009, Guerrero learned of the date and time of his interview, as well as the three panelists who would be interviewing him. The three panelists were Lieutenants Lee, Nagamine, and Cummings. Because he had a pending lawsuit against Nagamine and Cummings, Guerrero felt they would be

biased against him and spoke to Lieutenant Lee about it. Lee told him to put his request to change panelists in writing to then-First Deputy Lacadan.

After Lacadan reviewed Guerrero's request, he told Guerrero to redraft the memo with the proper chain of command and that he needed to include detailed and specific reasons for his belief that Lieutenants Nagamine and Cummings would be biased against him. Lacadan was concerned that, if he replaced Guerrero's panelists without specific reasons for doing so, he would also be obligated to change the other thirty applicants' panelists on short notice without specific reasons for doing so. Lacadan also told Guerrero that changing the panelists would be "problematic" because his request was made forty-eight hours before the interview was scheduled to take place. Nevertheless, Lacadan contacted the two deputies that Guerrero wanted to replace Cummings and Nagamine, but learned they were unavailable to conduct his interview.

Guerrero redrafted his request to include the proper chain of command, but he did not include specific reasons for his belief that Nagamine and Cummings would be biased. According to Guerrero, Lacadan did not ask him to include any further detail in his memo. Lacadan testified that the panelists were not replaced because of the short notice, because Guerrero did not present specific

reasons that warranted replacing them, and because he would have to accommodate all other such requests if he accommodated Guerrero.

When Guerrero arrived at his interview, he realized that his request to replace Lieutenants Nagamine and Cummings was denied. According to Lieutenant Lee, he asked all of the interview questions because he knew Guerrero was uncomfortable with the other panelists. Each panelist testified that they scored Guerrero based solely on his answers and that his EEOC complaints and lawsuit did not affect their scores. Pursuant to standard procedure, the panelists discussed Guerrero's scores for consistency, as they discussed all other applicants' scores. The panelists did not discuss Guerrero's complaints at anytime.

According to Clayton Kitamori, the personnel management specialist for DPS staffing services, his office audits the panelists' scores to ensure that the applicants receive full credit for their responses. After auditing all of the applicants' scores, Kitamori's office compiles the overall scores for the written test and oral interview. Kitamori testified that Guerrero was not chosen for the vacant Deputy Sheriff III positions because other applicants received higher overall scores than he did. On August 11, 2009, Kitamori sent Guerrero a memo notifying him that he was not selected for the promotion. (Ex. 59.)

On November 11, 2009, Guerrero filed a third complaint with EEOC and received a right to sue letter dated July 9, 2010.

IV.        Federal Complaint

On July 25, 2008, Guerrero filed this action against DPS. In the original Complaint, Guerrero asserted the following claims against DPS: (1) race and national origin discrimination under Title VII, (2) retaliation under Title VII, and (3) intentional infliction of emotional distress. After Guerrero amended the Complaint several times and after the Court entered orders granting in part and denying in part summary judgment, the following four claims proceeded to trial: (1) racial and national origin discrimination, based on Guerrero's suspension from working special duty assignments until he signed the Special Duty Acknowledgment Form, (2) racial and national origin discrimination, based on consequences Guerrero suffered after deputy Stankos filed a workplace violence complaint against him, (3) retaliation, based on the consequences resulting from Stankos's workplace violence complaint, and (4) retaliation, based on his non-promotion when he applied for a Deputy Sheriff III position.

A bench trial on these claims was held on February 8, 9, 10, and 18, 2011.

## DISCUSSION

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by offering evidence that "give[s] rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see EEOC v. The Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009). A plaintiff may establish a prima facie case either by meeting the four-part test in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion. Cordova v. State Farm Ins. Cos., 124 F.3d 1145, 1148 (9th Cir. 1997). A prima facie case under McDonnell Douglas requires a plaintiff to prove that: (1) he belongs to a protected class; (2) he performed his job adequately or satisfactorily; (3) he suffered an adverse employment action; and (4) other similarly situated employees who do not belong to the same protected class were treated differently. McDonnell Douglas, 411 U.S. at 802; see Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006); Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).

For a retaliation claim, the plaintiff's prima facie case consists of establishing that: "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000); Vasquez v. County of L.A., 349 F.3d 634, 646 (9th Cir. 2004); Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).

Once a prima facie case has been made, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000). If the employer does so, the plaintiff must then show that the articulated reason is pretextual "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

"Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer," Coghlan v. American Seafoods Co., LLC., 413 F.3d 1090, 1095 (9th Cir. 2005), whereas circumstantial evidence requires an additional inferential step to demonstrate discrimination.

14

For a discrimination claim, adverse actions are defined as those that "materially affect the compensation, terms, conditions, or privileges of employment." Chuang, 225 F.3d at 1126; Davis v. Team Electric Co., 520 F.3d 1080, 1089 (9th Cir. 2008). "Title VII does not limit its reach only to acts that take the form of cognizable employment actions such as discharge, transfer, or demotion." Lyons, 307 F.3d at 1118 (quotation marks and citation omitted).

The definition of adverse action for a retaliation claim is broader. An adverse action for purposes of a retaliation claim is defined as an action that "is reasonably likely to deter employees from engaging in protected activity." Ray, 217 F.3d at 1243; Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (a challenged action is materially adverse if "it might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'").

To determine whether a particular action is materially adverse, the court must employ an objective standard and consider the context and circumstances of the particular case. Burlington N., 548 U.S. at 68-69, 71.

"[A]ssigning more, or more burdensome, work responsibilities, is an adverse employment action." Davis, 520 F.3d at 1089. Transferring job duties, or actions that negatively affect the employee's compensation have also been found to constitute adverse employment actions. Fonseca v. Sysco Food Servs. of Ariz.,

Inc., 374 F.3d 840, 847 (9th Cir. 2004); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987). Being excluded from meetings, seminars, and positions that would have made the employee eligible for salary increases, and being given a more burdensome work schedule, if proven, were sufficient to establish adverse employment actions. Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 869 (9th Cir. 1996). In addition, undeserved performance ratings can constitute an adverse employment action. Yartzoff, 809 F.2d at 1378.

"Similarly situated" employees are those who have similar jobs and display similar conduct. See Metoyer v. Chassman, 504 F.3d 919, 950 (9th Cir. 2007) (citing Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) and Vasquez, 349 F.3d at 641). Moreover, "[e]mployees in supervisory positions are generally deemed not to be similarly situated to lower level employees." Vasquez, 349 F.3d at 641.

The Court now turns to Guerrero's claims of discrimination and retaliation.

I.      Discrimination Claims

        A.      Discrimination Regarding Special Duty Acknowledgment Form
                and Loss of a Special Duty Assignment

DPS does not dispute that Guerrero satisfies the first two elements of a discrimination claim under Title VII – i.e., that he belongs to a protected class

(Guamanian) and that he performed his job adequately or satisfactorily.  See

McDonnel Douglas, 41 U.S. at 802.  However, DPS argues that the other

McDonnel Douglas elements are not met.

     i.  Adverse Employment Action

    In establishing his prima facie case, Guerrero must show that he

suffered an adverse employment action.  Id.  At trial, Guerrero testified that he was

denied from working a special duty assignment on October 30, 2007, because he

did not sign the Special Duty Acknowledgment Form, which would have indicated

that he read and understood the special duty policies and procedures.  (Ex. 24 at 2.)

Sheriff Lum testified that it was his own decision to find a replacement for

Guerrero on October 30, 2007 because he did not sign the Form.  Leung, who is

the Special Duty Coordinator, confirmed that, pursuant to Sheriff Lum's directive,

he found a replacement for Guerrero's special duty assignment that day.  Based on

their testimony, Guerrero established that he was denied from performing his

special duty assignment on October 30, 2007.

     Special duty is defined as "any off-duty work that is . . . performed for

compensation by an officer for an employer other than the Department of Public

Safety."  (Ex. 111 at 1.)  Insofar as Guerrero proved that he was denied from

serving his special duty assignment on October 30, 2007, which in turn denied him

compensation for performing that off-duty work, the Court finds that Guerrero establishes an adverse employment action was taken against him. <u>Chuang</u>, 225 F.3d at 1125 (noting that Title VII prohibits discrimination "with respect to his compensation").

### ii.     Similarly Situated Employees

Guerrero must also establish that other similarly situated employees who do not belong in his protected class were treated differently than him. <u>McDonnel Douglas</u>, 411 U.S. at 802. At trial, Guerrero testified that deputy sheriff Patrick Quinlin[1] was chosen to replace him for the October 30, 2007 special duty assignment. He also stated that Quinlin is non-Guamanian and therefore not in his protected class. Guerrero further testified that Quinlin told him he did not sign the Special Duty Acknowledgment Form but was still allowed to perform the special duty assignment on October 30. Because DPS did not present evidence disputing Guerrero's testimony that Quinlin worked special duty without signing the Form, Guerrero establishes that Quinlin, a similarly situated employee, was treated differently than him. <u>McDonnel Douglas</u>, 411 U.S. at 802.

### iii.     Legitimate, Nondiscriminatory Reason

---

[1] The Court notes that Guerrero's pleadings spell this individual's name differently as "Quinlin" and "Quinlan." For consistency, this Order uses one spelling, "Quinlin."

Inasmuch as Guerrero proves his prima facie case of discrimination, the burden of production shifts to DPS to "articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang, 225 F.3d at 1123-24.

According to Guerrero, on August 13, 2007, while performing a special duty assignment at the State Department of Taxation, he fell ill and "needed to go home" at 1:45 p.m. even though his assignment was scheduled to end at 4:45 p.m. (Exs. 110, 112.) Guerrero testified that he did not know about the special duty policies and procedures and was therefore unaware of his obligations to "immediately notify[] the DA (District or division commander) or their designated representatives and the employer" and to "make every attempt to find a replacement" for that special duty assignment. (Ex. 111 at 4.) Instead, Guerrero merely "informed Deputy Joseph Naeahi that [he] was feeling ill and needed to go home." By failing to notify the proper supervisors, Guerrero failed to comply with the special duty policies and procedures.

In response to Guerrero's actions, Lieutenant Albert Cummings sent him a memo, explaining that, in the future, "proper notification of your departure from any special duty assignment should be documented and a replacement sought as soon as possible." (Ex. 110.) Cummings also stated: "Since the special duty

coordinator was still on duty, you should have notified her. This is a condition of the special duty policy." (Id.)

In response to Lieutenant Cummings's memo, Guerrero wrote to Sheriff Lum, explaining that he was unaware of the special duty policies and procedures. (Ex. 112.) Specifically, Guerrero stated that special duty policies and procedures were not covered during recruit training, that he "was not informed about the policies and procedures during any Special Duty assignment," and that he "was never given any documented manual about a Special Duty 'Policies and Procedures.'" (Ex. 112.) Sheriff Lum was concerned by Guerrero's memo because all deputy sheriffs serving special duty were required to understand such policies and procedures. Thus, as a result of Guerrero's explanation, Sheriff Lum decided to require all deputies who work special duty assignments to sign the Special Duty Acknowledgment Form, acknowledging that they read and understood the policies and procedures. When Sheriff Lum decided to make October 30, 2007 the deadline to sign and submit the Form, he was unaware that Guerrero had a special duty assignment on that date.

Leung prepared the Special Duty Acknowledgment Form and an accompanying memo explaining that, "Per Sheriff John Lum, effective immediately, all deputies working special duty assignments need to sign a Sheriff

Division Policy and Procedures acknowledgment form." (Ex. 24.) The memo stated that the "chief purpose of the acknowledgment form is to ensure deputies working special duty assignments understand the Sheriff Division policy and procedures dealing with Special duty." (Id.) The memo also warned that any "Deputy not turning in their acknowledgment form will not be allow[ed] to work any special duty assignments until they complete the form." (Id.) Sheriff Lum testified that the Acknowledgment Form was not implemented because of Guerrero's race or national origin, but rather to ensure that deputies understood the policies and procedures.

Prior to the October 30, 2007 deadline, Sheriff Lum called Leung and asked him to contact Guerrero to remind him to sign the Form. Sheriff Lum wanted to remind Guerrero because Guerrero had specifically stated that he was unaware of the policies and procedures and because Guerrero was the only deputy sheriff that Sheriff Lum knew to be unfamiliar with the policies.

According to Leung, he called Guerrero, who informed Leung that he would not sign the Form. After Leung told Sheriff Lum that Guerrero refused to sign the Form, Sheriff Lum directed Leung to find a replacement for Guerrero's October 30, 2007 special duty assignment. Leung complied by having another

deputy sheriff cover that assignment for Guerrero. Leung received Guerrero's signed Form the next day, on October 31, 2007.

Guerrero disputes Leung's testimony that he refused to sign the Form. In closing argument, Guerrero pointed out that he always wanted to make extra money whenever he could. Guerrero argued that he would not have refused to sign the Acknowledgment Form because he wanted to work special duty. However, the Court finds Leung's testimony about Guerrero's refusal to sign the Form more credible. Leung has been employed by DPS for more than twenty-two years and served as the Special Duty Coordinator since 2007. Leung has no reason to fabricate Guerrero's refusal to sign the Form. In fact, Leung called Guerrero to remind him to sign the Form because Sheriff Lum wanted to ensure that Guerrero signed and submitted it before the deadline. The Form was created because of Guerrero's admission that he was unaware of the special duty policies and procedures, and Leung and Sheriff Lum wanted to ensure that Guerrero signed the Form so he could continue working special duty. The Court therefore finds Leung's testimony that Guerrero refused to sign the Form more credible than Guerrero's testimony to the contrary.

Based on Sheriff Lum's and Leung's testimony, the Court concludes that DPS establishes a legitimate, nondiscriminatory reason for creating the

Acknowledgment Form and for denying Guerrero's special duty assignment on October 30, 2007. The Form was created because Guerrero violated the special duty policies and procedures and admitted that he was unaware of them. According to Sheriff Lum, deputy sheriffs were required to be familiar with the policies and procedures and the Acknowledgment Form ensured that all deputies performing special duty read and understood them. As Sheriff Lum testified, the Acknowledgment Form protects DPS's and Guerrero's liability by ensuring that the official policies and procedures are followed. Further, as the Acknowledgment Form memo stated, any deputy that did not submit a signed Form to Leung by October 30, 2007 would "not be allow[ed] to work any special duty assignments until they complete the form." (Ex. 24.) In light of Guerrero's refusal to sign the Form and given that Leung did not receive Guerrero's signed Form until October 31, 2007, Sheriff Lum and Leung had a legitimate and nondiscriminatory reason for reassigning Leung's October 30, 2007 special duty assignment to someone else.

iv.    Pretext

Having shown a legitimate and nondiscriminatory reason for creating the Form and reassigning Guerrero's special duty assignment, the burden shifts to Guerrero to show that the articulated reason was pretextual "either directly by

persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

In closing argument, Guerrero attempted to show pretext by again disputing Leung's testimony that he refused to sign the Form. He also argued that he found it suspicious that the deadline for submitting the Form fell on a day that Guerrero was assigned to work special duty. Guerrero also argued that the Form was directed at precluding him from working the October 30, 2007 special duty assignment. However, as noted above, the Court finds Leung's testimony that Guerrero refused to sign the Form credible. Additionally, Sheriff Lum testified that, at the time he chose the October 30 deadline, he did not know that Guerrero was assigned to work special duty on that day. It was not until later that Sheriff Lum learned Guerrero was assigned to special duty on October 30, 2007. Lastly, Sheriff Lum and Leung testified that the Form was created to ensure that all deputy sheriffs were familiar with and understood the special duty policies and procedures; the Form was not created because of Guerrero's race or national origin.

The Court concludes that Guerrero fails to establish that Sheriff Lum's reasons for creating the Form and for reassigning Guerrero's October 30,

2007 special duty assignment were pretextual. Guerrero does not show that a

discriminatory reason more likely motivated Sheriff Lum's actions or that the

legitimate reasons offered by DPS are unworthy of credence. Burdine, 450 U.S. at

256. Accordingly, Guerrero fails to prove discrimination under Title VII based on

the Acknowledgment Form or Sheriff Lum's decision to replace Guerrero for the

October 30, 2007 special duty assignment.

B.  Discrimination Regarding Transfer to Halawa and Loss of
    Deputy Sheriff Authorities

As noted above, DPS does not dispute that Guerrero satisfies the first

two elements of a discrimination claim under Title VII. See McDonnel Douglas,

41 U.S. at 802. However, DPS argues that the other McDonnel Douglas elements

are not met.

i.  Adverse Employment Action

Guerrero, Lieutenant Nagamine, and Sheriff Lum testified

consistently that, after deputy Stankos submitted his workplace violence complaint

against Guerrero, Guerrero was transferred from the Airport Section to the Halawa

Receiving Section, effective September 15, 2008. (Ex. 35.) Guerrero was also

"ordered to cease and desist from all contact with Deputy Stankos." (Id.) Later, on

October 2, 2008, Guerrero's authority as a deputy sheriff was limited to the eight

hours he was on duty at the Halawa Receiving Desk. (Ex. 41.) While off-duty,

25

Guerrero had "no authority as a Deputy Sheriff" and his "arrest powers and issued weapon" were taken away from him. (Exs 41-42.) Further, while assigned to Halawa,

> [Guerrero] cannot be used to assist in transporting and/or escorting any prisoners to the courts or the hospitals. He is restricted from driving any marked vehicles. He can be utilized for document runs but only as a last resort. If doing the document runs, he is not to wear the uniform shirt while driving the unmarked vehicle to and from the Receiving Desk. He is also restricted from bringing in "TSI's" from the gate.

(Ex. 42.)

Insofar as Guerrero was transferred from the Airport to Halawa, lost his arrest powers and weapon, had no authority as a deputy sheriff while off-duty, and had limited authority while on-duty at Halawa, the Court finds that Guerrero establishes that an adverse employment action was taken against him. Chuang, 225 F.3d at 1126 (noting that adverse employment actions "materially affect the compensation, terms, conditions, or privileges of employment"); see also Lyons, 307 F.3d at 1118 (noting that "cognizable employment actions" include "discharge, transfer, or demotion").

ii.     Similarly Situated Employees

Guerrero was transferred to Halawa and lost his deputy sheriff authorities because deputy Stankos filed a workplace violence complaint against

him.  However, Guerrero testified that he likewise submitted a workplace violence complaint against deputy Stankos but that Stankos was not transferred to another job location and did not lose his deputy sheriff authorities.  Sheriff Lum's testimony confirmed that Stankos was not transferred.  According to Guerrero, Stankos is non-Guamanian.  Therefore, Guerrero establishes that Stankos, a similarly situated employee who does not belong to Guerrero's protected class, was treated differently than him.  See McDonnel Douglas, 411 U.S. at 802.

   iii. Legitimate, Nondiscriminatory Reason

   Inasmuch as Guerrero proves his prima facie case of discrimination, the burden of production shifts to DPS to "articulate some legitimate, nondiscriminatory reason for the challenged action."  Chuang, 225 F.3d at 1123-24.

   With respect to transferring Guerrero to Halawa, Sheriff Lum and Lieutenant Nagamine consistently testified that, when one deputy sheriff submits a workplace violence complaint against another deputy, it is standard operating procedure (1) to separate the parties by removing the alleged perpetrator from the work site and (2) to have the parties cease and desist from contacting each other.

   The incident between Guerrero and deputy Stankos happened on September 10, 2008.  (Exs. 36-37, 115.)  The next day, on September 11, 2008,

Stankos submitted a workplace violence complaint against Guerrero, claiming that Guerrero yelled at and threatened him and that Stankos "felt that [Guerrero] might cause me bodily harm." (Ex. 115.) After reading Stankos's complaint, Sheriff Lum followed standard procedures to separate Stankos and Guerrero by removing the alleged aggressor (Guerrero) from the work site. Consequently, the next day, September 12, 2008, Sheriff Lum wrote a memo to Guerrero stating that he was being transferred to Halawa pending the investigation. (Ex. 35.) Sheriff Lum also followed standard procedures by having Guerrero and Stankos cease and desist from contacting each other. Lieutenant Nagamine testified that the decision to transfer Guerrero was not based on his race or national origin.

Guerrero did not submit his incident report until September 14, 2008. (Ex. 36.) Nowhere in that memo did Guerrero mention feeling threatened by Stankos. However, on September 16, 2008, Guerrero submitted his "Workplace Violence Complaint" against Stankos. (Ex. 37.) For the first time, Guerrero alleged that he "felt threatened by" Stankos on September 10, 2008 and "felt that he might have attacked me at that moment." (Id.)

Sheriff Lum testified that, after receiving Guerrero's workplace violence complaint, he did not transfer deputy Stankos because Guerrero and Stankos were already separated due to Guerrero's transfer to Halawa. Sheriff Lum

testified that the purpose of the standard operating procedure is to separate the parties. Because Guerrero had already been transferred to Halawa, there was no reason to transfer Stankos from the Airport. Further, Sheriff Lum testified that transferring Stankos would have created a hardship on the workplace because it would be difficult to find a replacement for both Stankos and Guerrero at the Airport when the Sheriff's Division is so small. The Court concludes that Sheriff Lum's reasons for transferring Guerrero while not transferring Stankos are legitimate and nondiscriminatory.

   With respect to the decision to remove Guerrero's deputy sheriff authorities, Sheriff Lum testified that the decision was based on Guerrero's actions during the hot pursuit. According to Guerrero's September 14, 2008 memo, he attempted to stop a vehicle for an expired safety inspection tag. (Ex. 36.) Guerrero's memo explained what happened after the vehicle finally stopped:

> As I exited my patrol car, I activated the patrol spot light
> and illuminated the suspect's vehicle interior. I then
> drew my firearm toward the occupants of the vehicle. At
> this point, I observed the driver bending forward as if he
> was reaching for something underneath his seat.

(Id.) After reading Guerrero's memo, Sheriff Lum and Lieutenant Nagamine were concerned because deputies should not draw their firearm during a routine traffic stop. They were most concerned because Guerrero's memo stated that he drew his

gun before observing the driver bend down to reach for something under the seat. Sheriff Lum stated that, based on Guerrero's chronology of events as stated in the memo, he should not have drawn his firearm. The fact that Guerrero drew his gun unfoundedly was a safety concern for Sheriff Lum, and he intended to have Guerrero retrained on the proper use of his firearm. Additionally, Sheriff Lum testified that it is standard procedure to remove a deputy's police powers and firearm if a firearm is drawn. As a result, Sheriff Lum removed Guerrero's firearm and limited his deputy sheriff authorities to his on-duty hours.

In sum, Sheriff Lum felt that the facts stated in Guerrero's memo did not warrant Guerrero drawing his firearm during a routine traffic stop. Sheriff Lum stated that Guerrero's actions, as stated in his own memo, created a grave safety concern that required Guerrero's firearm to be removed. Importantly, it was standard operating procedure to remove Guerrero's deputy authorities and firearm because he drew his gun. The Court concludes that Sheriff Lum's reasons for removing Guerrero's deputy sheriff authorities and issued firearm are legitimate and nondiscriminatory. See Chuang, 225 F.3d at 1123-24.

Accordingly, the Court concludes that DPS establishes legitimate and nondiscriminatory reasons for Guerrero's transfer to Halawa and for removing his deputy sheriff powers and firearm.

iv.    Pretext

Having shown legitimate and nondiscriminatory reasons for transferring Guerrero to Halawa and for removing his deputy sheriff authorities, the burden shifts to Guerrero to show that the articulated reasons were pretextual "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.

In his closing argument, Guerrero argued that Sheriff Lum's reasons for transferring him to Halawa and removing his firearm were pretextual because Sheriff Lum could have transferred him to another work site where he would not have to give up his firearm. Guerrero also argues that he was never sent for retraining, as Sheriff Lum had intended.

Importantly, Guerrero presented no evidence that there were other work sites with openings for deputy sheriffs to which Sheriff Lum could have transferred Guerrero. Sheriff Lum testified that the Sheriff's Division is small, which makes transferring deputy sheriffs difficult. Additionally, Sheriff Lum retired from DPS in May 2009, well before the investigation of Guerrero was complete. A new sheriff had taken office before the investigation was closed, and any decision on retraining Guerrero after he was cleared from the investigation

would have been for the new sheriff to make. Further, the Court finds Sheriff Lum highly credible. He worked for the Honolulu Police Department for twenty-three years and retired as a captain; also, he was the Sheriff at DPS for nearly four years before retiring in May 2009. Sheriff Lum is surely aware of the proper use of firearms and the standard operating procedures of DPS. Therefore, based on Sheriff Lum's credible testimony, the Court concludes that his legitimate and nondiscriminatory reasons for taking the challenged actions against Guerrero are sound. Guerrero has not convinced this Court that Sheriff Lum's reasons are pretextual. Burdine, 450 U.S. at 256. Accordingly, the Court concludes that Guerrero fails to show discrimination under Title VII based on his transfer to Halawa and the removal of his deputy sheriff authorities and firearm.

II.        Retaliation Claims

      A.        Retaliation Regarding Transfer to Halawa and Loss of Deputy Sheriff Authorities

      DPS does not dispute that Guerrero satisfies the first element of a retaliation claim under Title VII – i.e., that he engaged in protected activity by filing EEOC complaints and this federal action. See McDonnel Douglas, 41 U.S. at 802. However, DPS argues that the other elements of a retaliation claim are not met.

      i.        Adverse Employment Action

As discussed above, the Court concludes that transferring Guerrero to Halawa and removing his deputy authorities constitute adverse employment actions for a Title VII discrimination claim. The test for adverse employment actions for retaliation claims is even broader than for discrimination claims. For retaliation claims, an action is cognizable as an adverse employment action if it is "reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000). The Court concludes that transferring Guerrero to Halawa and removing his deputy sheriff authorities constitute adverse employments action for this retaliation claim as well.

        ii.      Causal Link Between Protected Activity and Adverse Employment Actions

During his closing argument, Guerrero argued that a causal link exists between the filing of his complaints and the employment actions taken against him by pointing to another incident, in which Sheriff Lum notified Lieutenant Lee of Guerrero's civil action. Guerrero contended this incident shows a pattern of retaliation against him.

According to Lieutenant Lee, Guerrero applied to work at the Airport Division in 2008. Before Lee decided on whether to hire Guerrero, Sheriff Lum notified Lee that Guerrero had filed a lawsuit against Lum. Sheriff Lum testified

that he was merely informing Lee about the civil lawsuit and stated that he did not

"warn" Lee or tell Lee to "be careful of" Guerrero.  Lee ultimately hired Guerrero.

In light of Sheriff Lum's credible testimony, the Court is persuaded

that he was merely notifying Lieutenant Lee about the lawsuit and not, as Guerrero

urges, retaliating against Guerrero for filing the lawsuit against him.  Without

evidence of other retaliatory acts, Plaintiff has failed to establish "circumstantial

evidence of a 'pattern of antagonism' following the protected conduct."  Porter v.

Cal. Dep't of Corrs., 419 F.3d 885, 895 (9th Cir. 2005).  Additionally, the mere

temporal proximity between Guerrero's complaints and his transfer to Halawa and

loss of deputy authorities is not sufficiently close to establish a causal link of

retaliation.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74

(2001) (holding that those cases which accept mere temporal proximity as

sufficient evidence of causality to establish a prima facie case uniformly hold that

temporal proximity must be "very close.").  Moreover, even "where an adverse

action follows closely on the heels of protected activity, an inference of retaliation

is not compelled where other evidence provides a reasonable basis for inferring

that adverse action was not retaliatory."  Bahri v. Home Depot USA, Inc., 242 F.

Supp. 2d 922, 953 (D. Or. 2002).  Here, DPS offered legitimate reasons for the

actions it took against Guerrero.  Without more, Guerrero fails to establish a causal

link between the filing of his complaints and his transfer to Halawa and loss of deputy authorities. The Court nevertheless addresses the remaining elements of a retaliation claim.

### iii. Legitimate, Nondiscriminatory Reason

As discussed above in the context of Guerrero's discrimination claim, the Court concludes that DPS offered legitimate and nondiscriminatory reasons for transferring Guerrero to Halawa and for limiting his deputy sheriff authorities.

### iv. Pretext

Guerrero's argument that Sheriff Lum's decisions are pretextual in the retaliation context is the same as those presented above with respect to the discrimination claim. As above, the Court concludes that Guerrero fails to establish pretext. Therefore, because Guerrero is unable to establish the requisite causal link and because he does not prove pretext, he fails to meet his burden on this retaliation claim based on his transfer to Halawa and the removal of his deputy sheriff authorities.

### B. Retaliation Regarding Non-Promotion to Deputy Sheriff III

As noted above, DPS does not dispute that Guerrero satisfies the first element of a retaliation claim under Title VII. See McDonnel Douglas, 41 U.S. at

802.  However, DPS argues that the other elements of a retaliation claim are not met.

  i.  Adverse Employment Action

  a.  Denial of Guerrero's Request to Change Panelists

Guerrero argues that the denial of his request to replace Lieutenants Cummings and Nagamine as his interview panelists constituted an adverse employment action.  As noted above, an adverse action for purposes of a retaliation claim is an action that "is reasonably likely to deter employees from engaging in protected activity."  Ray, 217 F.3d at 1243.  Stated differently, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington N., 548 U.S. at 68.

Guerrero felt that Lieutenants Cummings and Nagamine would be biased against him during the oral interview because he had filed this action against them.  Objectively viewed, the Court finds that an employee applying for a promotion would be reasonably deterred from filing a federal action against his interview panelists if he knew that any request to replace those panelists would be denied.  See Burlington N., 548 U.S. at 68-69.  Because the interview constitutes

50% of the applicants' scores and selection for the promotion is directly based on the scores, reasonable workers would likely refrain from suing the panelists who scored their oral interviews.  See id.  Accordingly, the Court finds that the denial of Guerrero's request to replace Cummings and Nagamine is an adverse employment action for this retaliation claim.

### b.  Non-Promotion

It is undisputed in this case that Guerrero was not selected for the promotion to Deputy Sheriff III.  It is well settled that the denial of a promotion is an adverse employment action in the Title VII retaliation context.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are . . . refusal to consider for promotion."); Lelaind v. City & County of San Francisco, 576 F. Supp. 2d 1079, 1097 (N.D. Cal. 2008) ("it well-established that a failure to promote is an adverse action that materially affects the terms, conditions or privileges of employment"); Gutierrez v. State of Wash. Dep't of Social & Health Servs., No. CV-04-3004-RHW, 2005 WL 2346956, at *6 (Sept. 26, 2005) (noting that the "[d]enial of a promotion certainly falls under [the] definition" of an adverse employment action in the retaliation context).  Therefore, Guerrero proves this element of a retaliation claim.

ii.  Causal Link Between Protected Activity and Adverse
Employment Actions

Guerrero has not established any causal link between the filing of his

complaints and the refusal to change panelists or his nonselection for the Deputy

Sheriff III positions.  Guerrero has not shown "circumstantial evidence of a

'pattern of antagonism' following the protected conduct."  Porter v. Cal. Dep't of

Corrs., 419 F.3d 885, 895 (9th Cir. 2005).  Further, the mere temporal proximity

between his complaints and the denial of his request to change panelists or his

nonselection is not sufficiently close to establish a causal link of retaliation.  See

Clark County School Dist., 532 U.S. at 273-74.  Moreover, as discussed below,

"other evidence provides a reasonable basis for inferring that adverse action was

not retaliatory" and therefore negates "an inference of retaliation."  See Bahri, 242

F. Supp. 2d at 953.  Without more, Guerrero fails to establish a causal link for this

retaliation claim.  Nevertheless, the Court addresses the remaining elements of this

claim below.

iii.  Legitimate, Nondiscriminatory Reason

Although Guerrero fails to prove a prima facie case of retaliation, the

Court addresses whether DPS articulated a legitimate, nondiscriminatory reason for

its actions.  See Chuang, 225 F.3d at 1123-24.

a.  Denial of Guerrero's Request to Change Panelists

Guerrero asked to have panelists Lieutenants Cummings and Nagamine replaced merely forty-eight hours before the interview. According to then-First Deputy Lacadan, he was unable to replace the panelists because of the short notice. Nevertheless, Lacadan contacted the two deputies that Guerrero wanted to replace Cummings and Nagamine, but learned they were unavailable at the interview time. Lacadan also testified that Guerrero's memo asking for the panelists to be replaced lacked specificity as to why he felt the would be biased. Lacadan gave Guerrero an opportunity to redraft his memo to provide specific reasons for feeling they would be biased, but Guerrero did not provide the requisite detail. Lacadan testified that, if he were to replace Guerrero's panelists without any specific reason or basis for doing so, he would have to extend that courtesy to the other thirty applicants by replacing their panelists on short notice without any basis for doing so. In sum, Guerrero's panelists were not replaced because there was not enough time to find replacements and because Guerrero did not provide sufficient reason for doing so. The Court is satisfied that Lacadan's testimony offers a legitimate and nondiscriminatory reason for denying Guerrero's request to change his interview panelists. See Chuang, 225 F.3d at 1123-24.

b.    Non-Promotion

With respect to Guerrero's non-promotion to the Deputy Sheriff III position, DPS offered evidence showing that Guerrero was not promoted based on his scores for the written test and oral interview. Clayton Kitamori, the personnel management specialist for DPS staffing services, testified that the written test and oral interview each comprise 50% of the total score for each applicant. He testified that, because other applicants had higher scores than Guerrero, he was not selected for the Deputy Sheriff III positions on Oahu.

Each of the panelists who interviewed Guerrero testified that they scored him based on his oral responses to the questions. Although each of them was aware of his pending lawsuit, they testified that the lawsuit had no effect on their scoring of his interview. Each of them testified that the scoring was based solely on his responses, and Kitamori confirmed that the scoring must be based only on whether the applicant correctly answered the questions. Further, as part of the standard procedure for interviews, after scoring Guerrero, the panelists compared scores to ensure that they scored Guerrero consistently, based on his answers. They did not mention his lawsuit in this conversation at all. Comparing scores was done after every interview, and all panelists testified that they followed standard procedures for all interviews, including Guerrero's. Importantly, Guerrero does not allege that Lee was biased against him, yet his scores were

consistent with the scores Cummings and Nagamine gave Guerrero, which supports their testimony that they scored him solely on his responses to the questions.

Pursuant to standard procedure, after the panelists scored all of the applicants, Kitamori's office conducted an audit of the scores. This ensures that each applicant was given the scores they deserve, based on their responses to the questions. Kitamori's office also compiled the overall scores for each applicant. Guerrero was not selected for the two Deputy Sheriff III positions on Oahu because other applicants scored higher than him. Additionally, other applicants had more experience than him. Lee testified that some applicants had twenty years of law enforcement experience, which is more experience than Guerrero had. The Court concludes that DPS offers a legitimate and nondiscriminatory reason for not selecting Guerrero for the promotion to Deputy Sheriff III. See Chuang, 225 F.3d at 1123-24.

iv.     Pretext

a.     Denial of Guerrero's Request to Change Panelists

Guerrero presented no evidence suggesting that Lacadan's decision to keep Cummings and Nagamine on the panel was pretextual. However, Guerrero does dispute Lacadan's testimony that Lacadan asked him to provide specific

reasons why he felt the panelists would be biased against him. According to Lacadan, after reviewing Guerrero's first memo regarding the panelists, Lacadan told him to redraft the memo with the correct chain of command and to include specific reasons why he felt they would be biased. Guerrero agrees that Lacadan wanted the chain of command amended but argues that Lacadan did not ask for specificity.

The Court finds Lacadan's testimony regarding specificity more credible than Guerrero's. At the time, Lacadan was the First Deputy and had retired from the Honolulu Police Department after serving twenty-five years there. Since this incident, Lacadan served as the Sheriff of DPS as well. Given his high rank and extended experience, the Court finds Lacadan to be highly credible. Guerrero has not argued that Lacadan was biased against him, and Lacadan therefore has no reason to fabricate his asking for specific reasons to replace the panelists. Indeed, Lacadan testified that, if Guerrero failed to provide specific reasons, then he would be obligated to change the thirty other applicants' panelists for no specific reason as well.

Because Guerrero fails to provide any reason that Lacadan's legitimate decision to keep Cummings and Nagamine on the panel was pretextual, Guerrero does not meet his burden on this retaliation claim.

b.     Non-Promotion

Guerrero attempts to argue that DPS's reason for not promoting him was pretextual because the panelists did not give him full credit for his oral interview answers.  However, Lieutenants Lee, Cummings, and Nagamine each testified that they scored him based on his oral answers and that his lawsuit did not affect their scores.

Further, Guerrero testified that it was merely his opinion that he should have received higher scores.  Guerrero admitted that he was not trained as a DPS interview panelist and had never served as a panelist before.  This is in contrast to  Cummings who sat on more than ten panels, Lee who served on about fifteen panels, and Nagamine who served on more than twenty-five panels.  Based on their experience serving as DPS interview panelists, the Court finds their testimony that they gave Guerrero all the points he deserved more credible than Guerrero's opinion that he should have scored higher.

The Court concludes that DPS established legitimate reasons for not selecting Guerrero for the Deputy Sheriff III positions and that he has not proven that the reasons are pretextual.  Accordingly, Guerrero fails to meet his burden on this retaliation claim.

## CONCLUSION

In light of the foregoing, the Court concludes that Guerrero failed to prove the following claims against DPS that were tried before this Court: racial and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964. The Clerk of Court is directed to enter judgment in favor of DPS on these claims and to close this case.

DATED: Honolulu, Hawaii, July 17, 2011.

IT IS SO ORDERED.



 /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

Guerrero v. State of Hawaii Dep't of Public Safety, Civ. No. 08-00344 BMK; FINDINGS OF FACT AND CONCLUSIONS OF LAW.

44